[Civ. No. 46121. Second Dist.. Div. Five. Oct. 17. 1975.]

RICARDO SILVA. Petitioner. v.
THE SUPERIOR COURT OF LOS ANGELES
COUNTY. Respondent;
THE PEOPLE. Real Party in Interest.

**COUNSEL**

Tom Eckhardt, Bob Youmans and Jim Gallion for Petitioner and for Amicus Curiae on behalf of Petitioner.

No appearance for Respondent.

John E. Howard, Acting District Attorney, Arnold T. Guminski, Donald J. Kaplan, Robert N. Jorgensen and Eugene D. Tavris, Deputy District Attorneys, for Real Party in Interest.

## Oinion

**STEPHENS, J.**—Ricardo Silva (petitioner), the duly recognized consul of the Republic of Mexico in Los Angeles,[1] was charged by indictment with conspiring to commit the crime of soliciting business for an attorney ("capping"), in violation of Penal Code section 182.[2] The criminal activity was alleged to have taken place between December 28, 1971, and June 30, 1974, during which time petitioner was serving in his capacity as a consul. As a result of the indictment, an action entitled People of the State of California v. Ricardo Silva, et al., No. A-310545, was instituted against petitioner. Petitioner's motion to dismiss the indictment on the basis of lack of jurisdiction was denied. Petitioner then filed a petition for an alternative writ of prohibition seeking to restrain the superior court and the district attorney from further proceedings against him, and to have the instant charges dismissed.

Petitioner contends: (1) that the courts of the State of California have no jurisdiction in the present action due to the federal constitutional and statutory provisions for exclusive jurisdiction in the federal courts of all actions and proceedings against consuls and vice consuls of foreign states; and (2) that even if the state courts are not precluded from exercising criminal jurisdiction, petitioner, as consul, is immune from prosecution since the acts complained of were within the scope of his official duties.

---

[1] Petitioner was recognized by the United States government on June 17, 1971. Petitioner's status was confirmed by telegram from Hampton Davis, Assistant Chief of Protocol, Department of State of the United States, dated January 25, 1975, and by a photocopy of Form DS-816C, consular identification card No. 3,495, issued to Ricardo Silva by the Department of State, which is commonly referred to as an "exequatur."

[2] Penal Code section 182 reads (in part): "If two or more persons conspire: 1. To commit any crime. . . . 4. To cheat and defraud any person of any property, by any means which are in themselves criminal, or to obtain money or property by false pretenses or by false promises with fraudulent intent not to perform such promises. 5. To commit any act injurious to the public health, to public morals, or to pervert or obstruct justice, or the due administration of the laws. . . . They are punishable as follows . . . . All cases of conspiracy may be prosecuted and tried in the superior court of any county in which any overt act tending to effect such conspiracy shall be done."

## Discussion

Article III, section 2 of the United States Constitution provides that the judicial power of the United States shall extend to *all cases* affecting ambassadors, other public ministers, and consuls, and that the Supreme Court shall have original jurisdiction in such cases. In *Bors* v. *Preston,* 111 U.S. 252, 256-261 [28 L.Ed. 419, 420-422, 4 S.Ct. 407], the Supreme Court held that article III, section 2, by conferring original (as distinguished from appellate) jurisdiction upon the Supreme Court, did not thereby confer exclusive jurisdiction. (Cf. *Brown* v. *Pitchess,* 13 Cal.3d 518, 521 [119 Cal.Rptr. 204, 531 P.2d 772]; 28 U.S.C. § 1251, subd. (b) (1).) However, section 1351 of title 28 of the United States Code provides: "The district courts shall have original jurisdiction, *exclusive of the courts of the States, of all actions and proceedings against consuls* or vice consuls of foreign states." (Italics added.) To determine the propriety of petitioner's initial contention, we must resolve the issue of whether the phrase "all actions and proceedings" was intended to encompass not only civil cases, but federal *and state* criminal proceedings as well.

A review of the history of section 1351 establishes conclusively that at no time has Congress even attempted to confer jurisdiction over state criminal proceedings against consuls on the federal courts or to deprive state courts of such jurisdiction.

The language of section 1351 originated in section 9 of the Judiciary Act of 1789 (1 Stat. 76), which invested the district courts with ". . . jurisdiction exclusively of the courts of the several States, of all suits against consuls or vice counsuls . . .," subject to an exception for certain offenses.[3] The Revised Statutes of the United States were subsequently enacted and became law on December 1, 1873. Section 711, subdivision (8) of the Revised Statutes declared that federal courts had exclusive jurisdiction of "all suits or proceedings . . . against consuls or vice consuls." (18 Stat. 135.) Although subdivision (8) was stricken from section 711 by the act of February 18, 1875 (18 Stat. 318), its language was

---

[3] The Judiciary Act of 1789, chapter 20, section 9 provided in pertinent part as follows: "[T]he district courts shall have, exclusively of the courts of the several States, cognizance of all crimes and offences that shall be cognizable under the authority of the United States, committed within their respective districts, or upon the high seas; where no other punishment than whipping not exceeding thirty stripes, a fine not exceeding one hundred dollars, or a term of imprisonment not exceeding six months, is to be inflicted. . . . And shall also have jurisdiction exclusively of the courts of the several States, of all suits against consuls or vice-consuls, *except for offences above the description aforesaid."* (Italics added.)

restored by the Judiciary Act of 1911, section 256, subdivision (8) (36 Stat. 1160).[4]

In 1948 Congress enacted 28 United States Code section 1351 (62 Stat. 934), which read: "The district courts shall have original jurisdiction, exclusive of the courts of the States, *of any civil action* against consuls or vice counsuls of foreign states." (Italics added.) In the same year, Congress also enacted section 3231 of title 18 of the United States Code (62 Stat. 683, 826), which provided:

"The district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States.

"Nothing in this title shall be held to take away or impair the jurisdiction of the courts of the several States under the laws thereof."

Thus, in 1948, jurisdiction over actions against consuls appeared to have been vested exclusively in the federal courts with respect to civil matters (tit. 28, § 1351) and violations of federal law (tit. 18, § 3231). The exercise of jurisdiction by state courts with respect to violations of state criminal laws was not barred.[5]

In 1949, section 1351 was amended to substitute the phrase "*all* actions and proceedings" for "any civil action." (Italics added.) The Congressional intent for the amendment was set forth as follows: "This amendment restores language of prior law. The term 'civil actions' as used in the revision was not adequate to cover all suits and proceedings as provided in the prior law." (Sen. Rep. No. 303, 81st Cong., 1st Sess., p. 4.) The "prior law," essentially resurrected by this amendment, prohibited state courts from exercising jurisdiction over civil actions against consuls of a foreign nation and, of course, over federal criminal proceedings. (*Davis* v. *Packard, et al.,* 32 U.S. 276 [8 L.Ed. 684];[6]

---

[4]The only change from section 711 of the Revised Statutes was that the word "and" replaced the word "or" to read "all suits and proceedings. . ."

[5]We need not comment on whether section 1351 as it read in 1948 was unconstitutional in light of the specific language of article III, section 2 ("the judicial power shall extend to *all cases affecting . . . consuls . . . .*") (Italics added.) The language of the Constitution cannot be circumvented by Congressional legislation.

[6]In *Davis,* the United States Supreme Court held that a New York court lacked jurisdiction in a civil suit brought against a foreign consul. Since civil actions involving state law can be litigated in federal courts on the basis of diversity of citizenship, no jurisdictional hiatus is created by vesting jurisdiction over such suits exclusively in the federal courts.

cf. *United States* v. *Ortega*, 24 U.S. (11 Wheat.) 467 [6 L.Ed. 521].) An exception to this prohibition was recognized in *Popovici* v. *Agler*, 280 U.S. 379 [74 L.Ed. 489, 50 S.Ct. 154]. There, the United States Supreme Court held that the states retain jurisdiction over divorce and alimony proceedings.

In two cases subsequent to the amendment of section 1351 in 1949 (*Kita* v. *Matuszak* (1970) 21 Mich.App. 421 [175 N.W.2d 551], and *Espinal* v. *Bayer* (1963) 41 Misc.2d 429 [246 N.Y.S.2d 107]), the state courts involved found that the exclusive jurisdiction of the federal courts extended to all actions, both civil and criminal, against foreign consuls. In *Espinal*, the court prohibited the respondents from proceeding against the petitioner (a consul) in the Criminal Court of the City of New York.

We note that if the state court has no jurisdiction under the unrestrictive language of section 1351, there would exist no court in which to prosecute petitioner.[7] To determine if this absence of judicial recourse to punish a consul for criminal behavior is the effect of section 1351, we must not only consider the preceding state court decisions, but also any relevant treaty provisions and federal judicial decisions. It has been stated that "[t]he powers and duties of consuls rest upon the law of nations as well as upon treaties." (*Schneider* v. *Hawkins*, 179 Md. 21 [16 A.2d 861, 863].)

Under clause two of article VI of the United States Constitution, both the laws of the United States made pursuant to the Constitution and all treaties made "under the Authority of the United States, shall be the *supreme Law of the Land;* and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any States to the Contrary notwithstanding." (Italics added.) In *Reid* v. *Covert*, 354 U.S. 1, 18 [1 L.Ed.2d 1148, 1164, 77 S.Ct. 1222], the United States Supreme Court held that acts of Congress and treaties are on a "full parity" with each other. ■ When provisions of an act of Congress and a treaty are inconsistent with each other, "the one last in date will control the other." (*Whitney* v. *Robertson*, 124 U.S. 190, 194 [31 L.Ed. 386, 388, 8 S.Ct. 456]; see also *Reid* v. *Covert, supra,* at p. 18 [1 L.Ed.2d at p. 1164]; *Hijo* v. *United States*, 194 U.S. 315, 324 [48 L.Ed. 994, 996, 24 S.Ct. 727].)

---

[7]In *Beal* v. *Missouri Pacific R. Co.*, 312 U.S. 45, 49-50 [85 L.Ed. 577, 579-580, 61 S.Ct. 418], the United States Supreme Court stated: "The federal courts are without jurisdiction to try alleged criminal violations of state statutes. The state courts are the final arbiters of their meaning and appropriate application, subject only to review by this Court if such construction or application is appropriately challenged on constitutional grounds."

However, "[w]hen the two relate to the same subject, the courts will always endeavor to construe them so as to give effect to both, if that can be done without violating the language of either." (*Id.*, at p. 194 [31 L.Ed. at p. 388]; see also *United States* v. *Lee Yen Tai*, 185 U.S. 213, 221 [46 L.Ed. 878, 883, 22 S.Ct. 629].) "[T]he purpose by statute to abrogate a treaty or any designated part of a treaty, or the purpose by treaty to supersede the whole or a part of an act of Congress, must not be lightly assumed, but must appear clearly and distinctly from the words used in the statute or in that treaty." (*United States* v. *Lee Yen Tai, supra,* at p. 221 [46 L.Ed. at p. 883]).

■ In the instant case, the applicable treaties in force between the United States and Mexico include documents drawn at two multilateral conventions (the Pan American Consular Convention, formalized on Feb. 20, 1928, and "entered into force" on Feb. 11, 1932 (47 Stat. 1976), and the Vienna Convention on Consular Relations, formalized on Apr. 24, 1963, and "entered into force" on Dec. 24, 1969 (21 U.S.T. 77)), and one unilateral meeting (formalized in Mexico City on Aug. 12, 1942, and "entered into force" on June 16, 1943 (57 Stat. 800).)[8] Although two of these treaties were in effect at the time of the *Espinal* decision, and all three at the time of the *Kita* decision, neither of the courts involved took cognizance of these documents. On the question of jurisdiction over criminal proceedings against a foreign consul, the following articles from the relevant treaties are of importance:

From the 1928 Pan American Convention (47 Stat. 1979-1980) (all italics added):

"Article 14

"In the absence of a special agreement between two nations, the consular agents who are nationals of the state appointing them, *shall neither be arrested nor prosecuted except in the cases when they are accused of committing an act classed as a crime by local legislation.*"

[8]There is no doubt that the documents emerging from these conventions are treaties in the constitutional sense. Each was proclaimed by the President after ratification by the Senate. (*Vergnani* v. *Guidetti*, 308 Mass. 450 [32 N.E.2d 272, 276]; see also *United States* v. *Belmont*, 301 U.S. 324, 330 [81 L.Ed. 1134, 1139, 57 S.Ct. 758].) As stated by the court in *Vergnani:* "Treaties are not infrequently denominated conventions." (*Id.*, at p. 276; cf. *Collins* v. *O'Neil*, 214 U.S. 113, 121, 122 [53 L.Ed. 933, 935-936, 29 S.Ct. 573].) Furthermore, the articles of the Vienna Convention on Consular Relations have been utilized and found controlling in two federal decisions which followed ratification of the treaty in 1969: *United States* v. *Wilburn* (5th Cir. 1974) 497 F.2d 946; *Heaney* v. *Government of Spain* (2d Cir. 1971) 445 F.2d 501.

"Article 16

"Consuls *are not subject to local jurisdiction for acts done in their official character and within the scope of their authority.* In case a private individual deems himself injured by the consul's action, he must submit his complaint to the government, which, if it considers the claim to be relevant, shall make it valid through diplomatic channels."

"Article 17

"*In respect to unofficial acts, consuls are subject, in civil as well as in criminal matters, to the jurisdiction of the state where they exercise their functions.*"

."Article 22

"Consuls engaged in business or exercising other functions apart from those pertaining to their consular duties are subject to local jurisdiction in all their activities not pertaining to the consular service."

From the 1942 unilateral treaty (57 Stat. 803) (italics added):

"Article II

"1.—*Consular officers,* nationals of the State by which they are appointed, and not engaged in any private occupation for gain within the territory of the State in which they exercise their functions, *shall be exempt from arrest in such territory except when charged with the commission of an act designated by local legislation as crime* other than misdemeanor and subjecting the individual guilty thereof to punishment by imprisonment. Such officers shall be exempt from military billetings, and from service of any military or naval, administrative or police character whatsoever."

And finally, from the 1963 Vienna Convention (21 U.S.T. 103-105, 113-114) (italics added):

"Article 40
"Protection of consular officers

"The receiving State shall treat consular officers with due respect and shall take all appropriate steps to prevent any attack on their person, freedom or dignity.

"Article 41
"Personal inviolability of consular officers

"1. Consular officers shall not be liable to arrest or detention pending trial, except in the case of a grave crime and pursuant to a decision by the competent judicial authority.

"2. Except in the case specified in paragraph 1 of this Article, consular officers shall not be committed to prison or liable to any other form of restriction on their personal freedom save in execution of a judicial decision of final effect.

"3. *If criminal proceedings are instituted against a consular officer, he must appear before the competent authorities.* Nevertheless, the proceedings shall be conducted with the respect due to him by reason of his official position and, except in the case specified in paragraph 1 of this Article, in a manner which will hamper the exercise of consular functions as little as possible. When, in the circumstances mentioned in paragraph 1 of this Article, it has become necessary to detain a consular officer, the proceedings against him shall be instituted with the minimum of delay.

"Article 42
"Notification of arrest, detention or prosecution

"In the event of the arrest or detention, pending trial, of a member of the consular staff, or of criminal proceedings being instituted against him, the receiving State shall promptly notify the head of the consular post. Should the latter be himself the object of any such measure, the receiving State shall notify the sending State through the diplomatic channel.

"Article 43
"Immunity from jurisdiction

"1. Consular officers and consular employees shall not be amenable to the jurisdiction of the judicial or administrative authorities of the receiving State *in respect of acts performed in the exercise of consular functions.*

"2. The provisions of paragraph 1 of this article shall not, however, apply in respect of a civil action either:

"(a) arising out of a contract concluded by a consular officer or a consular employee in which he did not contract expressly or impliedly as an agent of the sending State;

"(b) by a third party for damage arising from an accident in the receiving State caused by a vehicle, vessel or aircraft."

## "Article 55
### "Respect for the laws and regulations of the receiving State

"1. Without prejudice to their privileges and immunities, *it is the duty of all persons enjoying such privileges and immunities to respect the laws and regulations of the receiving State.* They also have a duty not to interfere in the internal affairs of that State."

## "Article 57
### "Special provisions concerning private gainful occupation

"1. *Career consular officers shall not carry on for personal profit any professional or commercial activity in the receiving State.*

"2. Privileges and immunities provided in this chapter shall *not* be accorded:

"(a) *to consular employees or to members of the service staff who carry on any private gainful occupation in the receiving State.*"

The apparent intent of these treaty provisions is not to extend to a consul the total immunity from prosecution afforded ambassadors, but rather, to grant him immunity only when his actions are within the scope of his duties. (See *Arcaya* v. *Paez,* 145 F.Supp. 464, 466-467 (affd. 244 F.2d 958); *Kita* v. *Matuszak, supra,* 21 Mich.App. 421 [175 N.W.2d 551].) Even if the articles of the 1928 and 1942 conventions were considered "inconsistent" with the 1949 amended version of section 1351 and thereby "abrogated" by that section (*United States* v. *Lee Yen Tai, supra,* at p. 221 [46 L.Ed. at p. 883]), the provisions of the Vienna Convention would take precedence over section 1351 due to its subsequent ratification. Like those of the treaties which preceded it, the provisions of the Vienna Convention contemplate that a consul will not be immune from prosecution for violations of the receiving state's criminal law unless his actions are within the scope of his consular duties.

However, the language of section 1351 is not "clearly and distinctly" opposed to the language of the 1928 and 1942 treaties. Nor is there such inconsistency as to preclude conformity between the statute and the treaties. The phrase "all actions and proceedings" *can* be interpreted to encompass only those civil and criminal actions which the federal courts have statutory jurisdiction to hear. Though it is not a prerequisite to our holding, this suggested construction alone would preclude section 1351 from being an impediment to criminal prosecution of foreign consuls in state courts. Supportive of this conclusion is the case of *Popovici* v. *Agler,* 280 U.S. 379, 383-384 [74 L.Ed. 489, 497-498, 50 S.Ct. 154], where, in dealing with the similarly worded section of the Judicial Code (§ 256), the Supreme Court stated:

"The language so far as it affects the present case is pretty sweeping but like all language it has to be interpreted in the light of the tacit assumptions upon which it is reasonable to suppose that the language was used. It has been understood that, 'the whole subject of the domestic relations of husband and wife, parent and child, belongs to the laws of the States and not to the laws of the United States,' *Ex parte Burrus,* 136 U.S. 586, 593, 594, and the jurisdiction of the Courts of the United States over divorces and alimony always has been denied. *Barber* v. *Barber,* 21 How. 582. *Simms* v. *Simms,* 175 U.S. 162, 167. *De La Rama* v. *De La Rama,* 201 U.S. 303, 307. A suit for divorce between the present parties brought in the District Court of the United States was dismissed. *Popovici* v. *Popovici,* 30 Fed. (2d) 185.

"The words quoted from the Constitution do not of themselves and without more exclude the jurisdiction of the State. *Plaquemines Tropical Fruit Co.* v. *Henderson,* 170 U.S. 511. The statutes do not purport to exclude the State Courts from jurisdiction except where they grant it to Courts of the United States. Therefore they do not affect the present case if it be true as has been unquestioned for three-quarters of a century that the Courts of the United States have no jurisdiction over divorce. If when the Constitution was adopted the common understanding was that the domestic relations of husband and wife and parent and child were matters reserved to the States, there is no difficulty in construing the instrument accordingly and not much in dealing with the statutes. 'Suits against consuls and vice-consuls' must be taken to refer to ordinary civil proceedings and not to include what formerly would have belonged to the ecclesiastical Courts.

"It is true that there may be objections of policy to one of our States intermeddling with the domestic relations of an official and subject of a foreign power that conceivably might regard jurisdiction as determined by nationality and not by domicil. But on the other hand if, as seems likely, the wife was an American citizen, probably she remained one notwithstanding her marriage. Act of September 22, 1922, c. 411, § 3; 42 Stat. 1021, 1022. Her position certainly is not less to be considered than her husband's, and at all events these considerations are not for us."

As the federal court has no jurisdiction to try consuls for violation of state criminal statutes, jurisdiction over this type of action—like the divorce proceedings in *Popovici*—rests exclusively in the state court. In light of this result and the intent of the preceding treaties, it is reasonable *not* to construe section 1351 as divesting state courts of jurisdiction over actions against consuls arising under local criminal statutes for acts outside the scope of consular duties.

Petitioner contends that even if the state court has jurisdiction over him, he has diplomatic immunity from prosecution since the acts which led to the alleged criminal conduct were within the scope of his duties as consul.

The Vienna Convention provides for immunity from jurisdiction for a consul "in respect of acts performed in the exercise of consular functions" (Vienna Convention, art. 43 (21 U.S.T. 104)), and includes an article enumerating consular functions (Vienna Convention, art. 5 (21 U.S.T. 82-85)), which we quote in the margin.[9] Although under article 5, subparagraph (i), petitioner may have the right to assist his nationals in acquiring legal representation, the manner in which such an authorized function was carried out determines whether this assistance was in fact rendered within the scope of his consular duties; this is a question of fact which must be resolved. The appropriate forum for such factual determination is reserved to the state trial court.

---

[9]"Consular functions consist in:

"(a) protecting in the receiving State the interests of the sending State and of its nationals, both individuals and bodies corporate, within the limits permitted by international law;

"(b) furthering the development of commercial, economic, cultural and scientific relations between the sending State and the receiving State and otherwise promoting friendly relations between them in accordance with the provisions of the present Convention;

"(c) ascertaining by all lawful means conditions and developments in the commercial, economic, cultural and scientific life of the receiving State, reporting thereon to the Government of the sending State and giving information to persons interested;

"(d) issuing passports and travel documents to nationals of the sending State, and visas

The alternative writ is discharged, the peremptory writ is denied, and the case is remanded for further proceedings in accordance with the views expressed in this opinion.

Kaus, P. J., and Hastings, J., concurred.

A petition for a rehearing was denied October 27, 1975, and petitioner's application for a hearing by the Supreme Court was denied December 11, 1975.

or appropriate documents to persons wishing to travel to the sending State;

"(e) helping and assisting nationals, both individuals and bodies corporate, of the sending State;

"(f) acting as notary and civil registrar and in capacities of a similar kind, and performing certain functions of an administrative nature, provided that there is nothing contrary thereto in the laws and regulations of the receiving State;

"(g) safeguarding the interests of nationals, both individuals and bodies corporate, of the sending State in cases of succession *mortis causa* in the territory of the receiving State, in accordance with the laws and regulations of the receiving State;

"(h) safeguarding within the limits imposed by the laws and regulations of the receiving State, the interests of minors and other persons lacking full capacity who are nationals of the sending State, particularly where any guardianship or trusteeship is required with respect to such persons;

"(i) subject to the practices and procedures obtaining in the receiving State, representing or arranging appropriate representation for nationals of the sending State before the tribunals and other authorities of the receiving State, for the purpose of obtaining, in accordance with the laws and regulations of the receiving State, provisional measures for the preservation of the rights and interests of these nationals, where, because of absence or any other reason, such nationals are unable at the proper time to assume the defence of their rights and interests;

"(j) transmitting judicial and extra-judicial documents or executing letters rogatory or commissions to take evidence for the courts of the sending State in accordance with international agreements in force or, in the absence of such international agreements, in any other manner compatible with the laws and regulations of the receiving State;

"(k) exercising rights of supervision and inspection provided for in the laws and regulations of the sending State in respect of vessels having the nationality of the sending State, and of aircraft registered in that State, and in respect of their crews;

"(l) extending assistance to vessels and aircraft mentioned in sub-paragraph (k) of this Article and to their crews, taking statements regarding the voyage of a vessel, examining and stamping the ships' papers, and, without prejudice to the powers of the authorities of the receiving State, conducting investigations into any incidents which occurred during the voyage, and settling disputes of any kind between the master, the officers and the seamen in so far as this may be authorized by the laws and regulations of the sending state;

"(m) performing any other functions entrusted to a consular post by the sending State which are not prohibited by the laws and regulations of the receiving State or to which no objection is taken by the receiving State or which are referred to in the international agreements in force between the sending State and the receiving State."